1  WO

2

3

4

5

6  **IN THE UNITED STATES DISTRICT COURT**

7  **FOR THE DISTRICT OF ARIZONA**

8

9  Tammy Rene Swing,                                  No. CV-14-00851-PHX-BSB

10                    Plaintiff,                      **ORDER**

11  v.

12  Carolyn W. Colvin,

13                    Defendant.

14  _____

15        Tammy Rene Swing (Plaintiff) seeks judicial review of the final decision of the

16  Commissioner of Social Security (the Commissioner) denying her application for benefits

17  under the Social Security Act (the Act).  The parties have consented to proceed before a

18  United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) and have filed briefs in

19  accordance with Local Rule of Civil Procedure 16.1.  For the following reasons, the

20  Court reverses the Commissioner's decision and remands for further proceedings.

21  **I.     Procedural Background**

22        On October 21, 2011, Plaintiff filed applications for a period of disability and

23  disability insurance benefits and supplemental security income under Titles II and XVI of

24  the Act.  (Tr. 15.)[1]  Plaintiff alleged that she had been disabled since March 31, 2010.

25  (*Id.*)    After  the  Social  Security  Administration  (SSA)  denied  Plaintiff's  initial

26  _____

27        [1]   Citations to "Tr." are to the certified administrative transcript of record.
28  (Doc. 13.)

1  applications and her request for reconsideration, she requested a hearing before an
2  administrative law judge (ALJ).  After conducting a hearing, the ALJ issued a decision
3  finding Plaintiff not disabled under the Act.  (Tr. 15-27.)  This decision became the final
4  decision of the Commissioner when the Social Security Administration Appeals Council
5  denied Plaintiff's request for review.  (Tr. 1-6); *see* 20 C.F.R. § 404.981 (explaining the
6  effect of a disposition by the Appeals Council.)  Plaintiff now seeks judicial review of
7  this decision pursuant to 42 U.S.C. § 405(g).

8  **II.    Administrative Record**

9          The record before the Court establishes the following history of diagnosis and
10  treatment related to Plaintiff's alleged impairments.  The record also includes opinions
11  from State Agency Physicians who examined Plaintiff or reviewed the records related to
12  her impairments, but who did not provide treatment.

13         **A.    Medical Treatment Evidence**

14         The record reflects that from 2010 through 2013, Plaintiff was diagnosed with
15  fibromyalgia and received regular treatment for fibromyalgia and related symptoms from
16  Dr. Viji Mahadevan (Tr. 515-43), Dr. Sherif Nasef (Tr. 545-53), Dr. Ehab Farouk
17  Abdulab (Tr. 702-05, 718-20), Dr. Ronald Burns (Tr. 955-60), Dr. Andy Le, and
18  providers at Sun Pain Management.  (Tr. 1054, 1318-23.)

19         During a November 2010 appointment with Dr. Mahadevan, Plaintiff reported that
20  she tried to ride her bike, swim, or walk daily to maintain her weight.  (Tr. 541.)
21  Dr. Mahadevan recommended that Plaintiff continue with aquatherapy.  (Tr. 538, 543,
22  547.)

23         In 2011, Dr. Abdulab referred Plaintiff to a neurologist for her headaches.
24  (Tr. 693-94.)  Neurologist Jatin Shah, M.D., treated Plaintiff for chronic headaches in
25  2011 and 2012.  (Tr. 633-37, 639-42.)  Dr. Shah observed photophobia and phonophobia.
26  (Tr. 633 (noting that Plaintiff was "lying in a dark room when [Dr. Shah] went to
27  examine her because of the headache"), 639 (noting that noise and light bothered Plaintiff
28  during an attempted EMG).)  Dr. Shah prescribed medication (Tr. 633-37, 639-42), and

1   prescribed occipital injections in 2011. (Tr. 634.) Plaintiff sought emergency room

2   treatment for headaches several times during 2010 and 2011. (Tr. 1147-50, 1159, 1170,

3   1180, 1193.)

4        Plaintiff was also treated for degenerative disc disease of the cervical and lumbar

5   spine. A July 20, 2011 MRI of Plaintiff's cervical spine showed C5 to C7 spondylosis

6   and arthropathy causing neural foraminal and central stenosis. (Tr. 643-44.) During

7   appointments with Dr. Abdulab in 2011 and 2012, Plaintiff reported low back pain

8   (Tr. 689, 700, 703, 704, 718) and neck pain (Tr. 690-91, 693-94, 703, 704). Plaintiff's

9   back pain was treated with pain medication, including Percocet and hydrocodone, and

10  lumbar trigger point injections. (Tr. 689, 690-93, 718, 955-56.) Plaintiff was referred to

11  physical therapy for her neck and back pain. (Tr. 572-78, 697, 700, 935.) In May 2011,

12  Dr. Abdulab noted that physical therapy was not helping. (Tr. 697.) On January 25,

13  2012, Dr. Abdulab stated that Plaintiff had "failed" physical therapy. (Tr. 700.) A

14  January 26, 2012 discharge summary completed by the physical therapist notes that

15  Plaintiff's compliance was poor, explaining that she attended sixty percent or less of her

16  scheduled appointments. (Tr. 578.)

17       In 2011, Dr. Mahadevan also treated Plaintiff for pain and swelling in her knees

18  and ankle. (Tr. 520, 533, 538, 542.) A March 2011 MRI of Plaintiff's right knee

19  revealed chondromalacia along the medial patellar facet. (Tr. 555.)

20       Plaintiff also received treatment for pain and numbness in her upper extremities.

21  (Tr. 641-42.) In 2011, motor and sensory nerve studies and an EMG revealed "early

22  evidence" of carpal tunnel syndrome. (Tr. 641-42.) Nerve studies and an EMG in 2013

23  revealed "very early evidence of carpal tunnel syndrome in right upper extremity."

24  (Tr. 1315-16.) On May 11, 2012, Dr. Shah administered a "left carpal tunnel injection."

25  (Tr. 631-32 (left wrist injected with bupivacaine and depomedrol).) Treatment notes

26  from Sun Pain Management in 2012 indicate that Plaintiff had a weak grip in her right

27  and left upper extremities and that she wore a brace on her left wrist. (Tr. 935-38, 1338-

28  39.)

### B.    Medical Opinion Evidence

#### 1.    Michael D. Rabara, Psy.D.

As part of the Agency's consideration of Plaintiff's applications for benefits, on June 25, 2012, Michael D. Rabara, Psy.D, examined Plaintiff.  (Tr. 657-62.)  Plaintiff reported fibromyalgia, migraines, irritable bowel syndrome, sore knees, carpal tunnel syndrome, and neck pain.  (Tr. 657.)  The referral from the Agency indicated that Plaintiff also had short-term memory loss.  (*Id.*)  Dr. Rabara administered psychological tests including the WAIS-IV, WMS-IV, and the Trail Making Test.  (*Id.*)  He diagnosed depressive disorder with anxious features, pain disorder associated with psychological factors and fibromyalgia, and borderline intellectual functioning. (Tr. 661.)

Dr. Rabara noted that Plaintiff's "effort was questionable" on psychological testing.  (Tr. 660.)  With regard to the WAIS-IV intelligence test, Dr. Rabara stated that Plaintiff's scores were provided "only for reference" because their "validity is uncertain secondary to questionable effort."  (*Id.*)  Dr. Rabara explained:

> Her demeanor during the interview was polite and compliant, but there was a sense that she was overemphasizing her various symptoms and limitations.  However, this is difficult to judge without any supporting medical records, but it may be relevant that she exhibited a number of overt pain behaviors throughout the exam.  During the testing, she frequently complained about the perceived difficulty of the various tasks presented to her and sometimes seemed to give up very easily.  She also seemed to be calling attention to her various pain complaints.  Her effort seemed variable at best, but on the Rey 15 Item Memory Test, she recalled only 1 item in the correct position. She then included 10 items not in the original stimuli and in and positions that had a vertical, rather than horizontal sequence of the original design.  Such an error is very atypical and suggestive of intentionally poor effort.

(*Id.*)

Dr. Rabara stated that although Plaintiff seemed to experience genuine depression and anxiety, she had not apparently sought behavioral health treatment and some of her claims seemed "vague."  (Tr. 661.)  Dr. Rabara found that Plaintiff's test scores seemed "much lower than what her reported education and work history suggest."  (*Id.*)  Dr. Rabara estimated that Plaintiff had "borderline to low average cognitive skills," but

1   noted that "her current scores were much worse and some highly atypical errors on a
2   screening measure of effort make her overall effort very questionable." (*Id.*)

3              **2.**        **Adriana Tarazon Weyer, Ph.D.**

4         On December 14, 2012, state agency consultant Dr. Weyer examined Plaintiff for
5   her benefits applications. (Tr. 1085.)  She used several examination procedures including
6   a psychological survey, WAIS-IV, Bender Gestalt Test, WMS-IV, Trail Making Test,
7   and the CTONI-2. (*Id.*)  Dr. Weyer diagnosed major depressive disorder. (Tr. 1088.)

8         Dr. Weyer noted that Plaintiff displayed "no significant memory or attention
9   problems" during the interview and put forth "good effort" on observation. (Tr. 1088.)
10  However, Dr. Weyer noted that Plaintiff "appeared to be putting forth less than optimal
11  effort" during testing. (*Id.*)  For instance, she "responded very quickly at times and gave
12  up easily on more difficult tasks." (*Id.*)

13        Dr. Weyer administered the CTONI-2, a nonverbal measure of intelligence. (*Id.*)
14  Dr. Weyer stated that Plaintiff "earned an IQ of 65," but was "observed to give up easily
15  on more difficult tasks and provide very quick responses at this point." (*Id.*)  Dr. Weyer
16  opined that Plaintiff's IQ score "may reflect lack of optimal effort and therefore is likely
17  an underestimation of her actual abilities." (*Id.*)  Dr. Weyer concluded that Plaintiff's
18  effort on intelligence testing "was questionable." (Tr. 1088.)  She also stated that,
19  although Plaintiff seemed to have some level of cognitive impairment, her scores on
20  testing were "difficult to interpret due to [Plaintiff's] perceived lack of effort during
21  testing." (*Id.*)

22        Dr. Weyer completed a Psychological/Psychiatric Medical Source Statement.
23  (Tr. 1090.)  She opined that Plaintiff may perform better with supervision, including
24  explanation of tasks, extra time to complete tasks, and redirection as needed. (*Id.*)
25  Dr. Weyer also found that Plaintiff may have "moderate difficulties on tasks requiring an
26  ability to complete a normal workday and workweek without interruptions from
27  psychologically based symptoms." (*Id.*)

28

### 3.     Ronald Burns, M.D.

On May 30, 2013, treating physician Dr. Burns completed a medical assessment of ability to do work related physical activities.  (Tr. 1310.)  He opined that Plaintiff could sit for thirty minutes continuously for a total of two hours in an eight-hour day.  (*Id.*)  He opined that she could stand or walk for thirty minutes continuously and for less than an hour total during an eight-hour day.  (*Id.*)  To support these limitations, he explained that Plaintiff needed "frequent rest periods."  (*Id.*)

Dr. Burns found Plaintiff limited to lifting ten pounds occasionally.  (*Id.*)  He also opined that Plaintiff should never stoop, squat, crawl, or climb, and that she was limited to occasional reaching and gross or fine manipulation with her right and left upper extremities.  (Tr. 1310-11.)  He further found that Plaintiff should avoid unprotected heights, moving machinery, and occupational driving.  (*Id.*)  He also found that Plaintiff's pain and fatigue were moderately severe and would cause her to be "off task" eleven to fifteen percent of the time.  (Tr. 1312.)

### 4.     State Agency Reviewing Physicians

#### a.     Ramona Bates, M.D.

On May 9, 2012, state agency consultant Dr. Bates reviewed the medical record. (Tr. 620.)  She noted Plaintiff's diagnoses of fibromyalgia, chronic neck and back pain, and headaches.  (*Id.*)  She assessed exertional limitations consistent with light work. (Tr. 621, 628.)

#### b.     Paula Lynch, M.D.

On July 18, 2012, state agency medical consultant Dr. Lynch reviewed the medical records and found "insufficient evidence" of mental impairments. (Tr. 665, 677, 679.)  Dr. Lynch opined that the available medical evidence was insufficient to establish mental impairment status or function relevant to a date last insured of March 31, 2010. (Tr. 677, 679.)

///

### c.     Susan Daugherty, Ph.D.

On January 16, 2013, Susan Daugherty, Ph.D., reviewed Plaintiff's medical records.  (Tr. 1102-15.)   Dr. Daugherty noted that Plaintiff had mild restriction in activities of daily living, moderate difficulties maintaining social functioning, and moderate difficulties maintaining concentration, persistence, or pace.  (Tr. 1112.)  She concluded that Plaintiff could perform work "where interpersonal contact is incidental to the work performed, e.g. assembly work; complexity of tasks is learned and performed by rote, few variables, little judgment; supervision required is simple, direct and concrete (unskilled)." (Tr. 1100-01.)

## III.     The Administrative Hearing

Plaintiff was in her early forties at the time of the administrative hearing and the ALJ's decision.  (Tr. 16, 201.)   She had the equivalent of a high school education. (Tr. 45, 658.)  She took community college course, but did not earn a degree.  (Tr. 45, 658, 1086.)   Plaintiff had past relevant work as a custodian, warehouse worker, and machine operator.  (Tr. 47, 58-59, 258, 301-08, 332-45.)   She testified that she was unable to work due to her impairments and symptoms of impairments including daily headaches, fibromyalgia, carpal tunnel syndrome, and back and neck pain.  (Tr. 47, 50.) She testified that her pain medications caused drowsiness and that cortisone injections and a TENS unit aggravated, rather than relieved, her pain.  (Tr. 50, 57, 60.)  She stated that she wore wrist splints for carpal tunnel syndrome and frequently dropped things. (Tr. 57, 60.)  She also testified that she has problems with memory and concentration. (Tr. 63.)  The vocational expert testified that an individual with the limitations identified in the ALJ's residual functional capacity (RFC) could not perform Plaintiff's past relevant work, but could perform other work that existed in significant number in the national economy.[2]  (Tr. 20-21, 70-71.)

## IV.     The ALJ's Decision

---

[2]    As set forth below in Section IV.B, the ALJ found that Plaintiff had the RFC to "perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), subject to" several limitations.  (Tr. 20-21.)

1   A claimant is considered disabled under the Social Security Act if she is unable
2   "to engage in any substantial gainful activity by reason of any medically determinable
3   physical or mental impairment which can be expected to result in death or which has
4   lasted or can be expected to last for a continuous period of not less than 12 months."  42
5   U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A) (nearly identical standard for
6   supplemental security income disability insurance benefits).   To determine whether a
7   claimant is disabled, the ALJ uses a five-step sequential evaluation process.   *See* 20
8   C.F.R. §§ 404.1520, 416.920.

9   **A.      The Five Step Sequential Evaluation Process**

10  In the first two steps, a claimant seeking disability benefits must initially
11  demonstrate (1) that she is not presently engaged in a substantial gainful activity, and
12  (2) that her medically determinable impairment or combinations of impairments is severe.
13  20 C.F.R. §§ 404.1520(b) and (c), 416.920(b) and (c).  If a claimant meets steps one and
14  two, there are two ways in which she may be found disabled at steps three through five.
15  At step three, she may prove that her impairment or combination of impairments meets or
16  equals an impairment in the Listing of Impairments found in Appendix 1 to Subpart P of
17  20 C.F.R. Part 404. 20 C.F.R. § 404.1520(a)(4)(iii).    20 C.F.R. §§  404.1520(d),
18  416.920(d).   If so, the claimant is presumptively disabled.  If not, the ALJ determines the
19  claimant's RFC.    20 C.F.R. §§ 404.1520(e), 416.920(e).    At step four, the ALJ
20  determines whether a claimant's RFC precludes her from performing her past relevant
21  work. 20 C.F.R. §§ 404.1520(f), 416.920(f).  If the claimant establishes this prima facie
22  case, the burden shifts to the government at step five to establish that the claimant can
23  perform other jobs that exist in significant number in the national economy, considering
24  the claimant's RFC, age, work experience, and education.  20 C.F.R. §§ 404.1520(g),
25  416.920(g).  If the government does not meet this burden, then the claimant is considered
26  disabled within the meaning of the Act.
27  / / /
28

### B.    The ALJ's Application of the Five Step Evaluation Process

Applying the five-step sequential evaluation process, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date, March 31, 2010.  (Tr. 17.)  At step two, the ALJ found that Plaintiff had the following medically determinable impairments: "fibromyalgia, chronic headaches, chronic bilateral knee and ankle pain, gastroesophageal reflux disease (GERD), degenerative disc disease of the cervical and lumbar spine, depressive disorder not otherwise specified (NOS), organic mental disorder not otherwise specified (NOS), and intellectual disability (20 C.F.R. 404.1520(c) and 416.920(c))."  (*Id.*)  The ALJ found that Plaintiff did not have an impairment or combination of impairments that significantly limited (or was expected to significantly limit) her ability to perform basic work-related activities for twelve consecutive months.  (Tr. 18.)  The ALJ found that Plaintiff had the RFC to "perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), subject to" several limitations.    (Tr. 20.)    The ALJ clarified that Plaintiff could perform work when "interpersonal contact is incidental to work performed; complexity of tasks is learned and performed by rote, with few variables, and little judgment; and supervision is simple, direct, and concrete."  (Tr. 20-21; *see* Tr. 1100.)  The ALJ found that Plaintiff could not perform her past relevant work, but she could perform other work that existed in significant number in the national economy.  (Tr. 25-26.)  He concluded that Plaintiff had not been under a disability as defined in the Act from March 31, 2010 through the date of his decision.  (Tr. 27.)  Therefore, the ALJ denied Plaintiff's applications for a period of disability and disability insurance benefits and supplemental security income.  (*Id.*)

### V.    Standard of Review

The district court has the "power to enter, upon the pleadings and transcript of record, a judgment affirming, modifying, or reversing the decision of the Commissioner, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  The district court reviews the Commissioner's final decision under the substantial evidence standard and must affirm the Commissioner's decision if it is supported by substantial evidence

1    and it is free from legal error.  *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996);

2    *Ryan v. Comm'r of Soc. Sec. Admin.*, 528 F.3d 1194, 1198 (9th Cir. 2008).  Even if the

3    ALJ erred, however, "[a] decision of the ALJ will not be reversed for errors that are

4    harmless."  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

5         Substantial evidence means more than a mere scintilla, but less than a

6    preponderance; it is "such relevant evidence as a reasonable mind might accept as

7    adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971)

8    (citations omitted); *see also Webb v Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005).  In

9    determining whether substantial evidence supports a decision, the court considers the

10   record as a whole and "may not affirm simply by isolating a specific quantum of

11   supporting evidence."  *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (internal

12   quotation and citation omitted).  The ALJ is responsible for resolving conflicts in

13   testimony, determining credibility, and resolving ambiguities.  *See Andrews v. Shalala*,

14   53 F.3d 1035, 1039 (9th Cir. 1995). "When the evidence before the ALJ is subject to

15   more than one rational interpretation, [the court] must defer to the ALJ's conclusion."

16   *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004) (citing

17   *Andrews*, 53 F.3d at 1041).

18   **VI.    Plaintiff's Claims**

19        Plaintiff raises the following claims: (1) the ALJ erred by rejecting the opinion of

20   treating physician Dr. Burns and by rejecting opinions on two headaches questionnaires;

21   (2) the ALJ erred by concluding that Plaintiff's impairments did not meet or equal Listing

22   12.05C; (3) the ALJ erred by assessing an RFC that did not include all of the limitations

23   that Dr. Weyer identified; and (4) the ALJ erred by discounting Plaintiff's subjective

24   complaints.  (Doc. 14.)  The Court considers these claims below, first addressing claim

25   one, then addressing claim four, claim two, and claim three.

26        **A.    Weight Assigned to Medical Source Opinions**

27        Plaintiff argues that the ALJ erred in weighing the medical source opinion

28   evidence.  (Doc. 14 at 7.)  In weighing medical source opinion evidence, the Ninth

1   Circuit distinguishes between three types of physicians: (1) treating physicians, who treat
2   the claimant; (2) examining physicians, who examine but do not treat the claimant; and
3   (3) non-examining physicians, who neither treat nor examine the claimant.  *Lester v.*
4   *Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  Generally, more weight is given to a treating
5   physician's opinion.  *Id*.  The ALJ must provide clear and convincing reasons supported
6   by substantial evidence for rejecting a treating or an examining physician's
7   uncontradicted opinion.  *Id.*; *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998).  An
8   ALJ may reject the controverted opinion of a treating or an examining physician by
9   providing specific and legitimate reasons that are supported by substantial evidence in the
10  record.  *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005); *Reddick*, 157 F.3d at
11  725.

12      Opinions from non-examining medical sources are entitled to less weight than
13  opinions from treating or examining physicians.  *Lester*, 81 F.3d at 831.  Although an
14  ALJ generally gives more weight to an examining physician's opinion than to a non-
15  examining physician's opinion, a non-examining physician's opinion may nonetheless
16  constitute substantial evidence if it is consistent with other independent evidence in the
17  record. *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002).   When evaluating
18  medical opinion evidence, the ALJ may consider "the amount of relevant evidence that
19  supports the opinion and the quality of the explanation provided; the consistency of the
20  medical opinion with the record as a whole; [and] the specialty of the physician providing
21  the opinion . . . ."  *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007).

## 1.      Weight Assigned to Dr. Burns' Opinion

23      Dr. Burns found Plaintiff limited to sitting two hours per day and standing or
24  walking less than one hour per day.  (Tr. 1310-12.)  He found Plaintiff limited to lifting
25  ten pounds occasionally, occasional gross or fine manipulation with her upper
26  extremities, and also assessed postural limitations.  (*Id.*)  He also concluded that Plaintiff
27  would be off task eleven to fifteen percent of the time due to pain and fatigue.  (*Id.*)  The
28  ALJ assigned Dr. Burns' opinion no weight because the ALJ concluded that his opinions

1    were inconsistent with his treatment notes and with the medical record that indicated that

2    Plaintiff was stable on medication.[3]   (Tr. 24.)   The ALJ also found Dr. Burns' opinions

3    inconsistent with evidence in the record indicating that Plaintiff could walk, swim, and

4    ride a bicycle.  (*Id.*)

5        The ALJ properly assigned Dr. Burns' opinion no weight by providing specific

6    and legitimate reasons, which are supported by substantial evidence in the record.  *See*

7    *Bayliss*, 427 F.3d at 1216.   The ALJ discussed the medical record (Tr. 23-25) and

8    properly discounted Dr. Burns' opinions as inconsistent with the record and his treatment

9    notes.  (Tr. 24); *see Batson*, 359 F.3d at 1195 (an ALJ may discredit treating physicians'

10   opinions that are unsupported by the record as a whole or by objective medical findings).

11       First, in October 2012, Plaintiff reported to Dr. Burns at Sun Pain Management

12   that her pain was a level eight to ten and he administered a series of trigger point

13   injections in her lumbar spine.  (Tr. 955-56.)  In December 2012, Plaintiff reported that

14   her pain level was six.   (Tr. 1336-37.)   Another treatment note from Sun Pain

15   Management describes Plaintiff's pain as stable with medications.  (Tr. 1318.)  Plaintiff

16   reported her pain level as between five and ten and reported injections had decreased her

17   symptoms and pain.  (*Id.*)  In January 2013, Plaintiff reported that her pain was at level

18   four to six with medication.  (Tr. 1333.)  She was considered stable, with no change in

19   medications "due to optimal pain control and meeting opioid goals." (Tr. 1335.)  In July

20   2013, Plaintiff's pain was at a level five without medication, and she received series of

21   trigger point injections.  (Tr. 1321-23.)  She remained stable in August 2013 with no

22   change in medication "due to optimal pain control and meeting opioid goals." (Tr. 1318-

23   20.)  Thus, substantial evidence in the record supports the ALJ's determination that the

24   limitations Dr. Burns assessed were inconsistent with the medical record.  Although the

---

26        [3]  The ALJ also rejected Dr. Burns' opinion because he was not a specialist in
27   orthopedics.  (Tr. 24.)  Plaintiff argues that this is not relevant to the assessment of the
     doctor's opinion.  (Doc. 14 at 8-9.)  The Commissioner states that she does not rely on
     this  reason  to  support  the  ALJ's  disability  determination.    (Doc. 16  at  10  n.3.)
28   Additionally, a specialist's opinion is not required to support a finding of disability.  *See*
     20 C.F.R. § 404.1527.

1    record could be interpreted more favorably to Plaintiff, the Court "must uphold the ALJ's

2    decision where the evidence is susceptible to more than one rational interpretation."

3    *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989); *see Batson*, 359 F.3d at 1198.

4            Second, the ALJ also found that the limitations Dr. Burns identified were

5    inconsistent with records showing that Plaintiff walked, swam, and rode a bicycle.

6    (Tr. 22.)  Substantial evidence in the record supports that ALJ's determination.  In a

7    November 23, 2010, treatment note, Dr. Mahadevan indicated that Plaintiff rode her

8    bicycle every day and swam or walked several times per week.  (Tr. 541.)  Physical

9    therapy notes from April 2011 indicate that Plaintiff continued to ride her bicycle and

10   walked about thirty minutes per day.  (Tr. 1214, 1218, 1220.)  A treatment note in

11   November 2011 indicates Plaintiff rode her bicycle and walked, and that she had some

12   swelling in her knee after walking but not much after bicycling.  (Tr. 652.)  On October

13   12, 2012, Plaintiff reported riding her bicycle and "do[ing] some more things" without

14   increased pain.  (Tr. 894.)

15           Plaintiff asserts that evidence of her physical activities does not detract from her

16   claim of disability because her doctors encouraged exercise and she "failed" physical

17   therapy "many times."  (Doc. 14 at 9-10 (citing Tr. 578, 697, 700).)  The May 2011 and

18   January 25, 2012 treatment notes that Plaintiff cites state that she "failed" physical

19   therapy and that physical therapy was "not helping."  (Tr. 697, 700.)  However, as the

20   ALJ noted, evidence in the record also indicates that Plaintiff had poor compliance with

21   physical therapy.  For instance, a January 24, 2012 treatment note from Plaintiff's

22   physical therapist states that Plaintiff would "greatly benefit" from continued therapy two

23   to three times per week for an additional four weeks.  (Tr. 575.)  A January 26, 2012

24   treatment note states that Plaintiff's physician had discharged her from physical therapy.

25   (Tr. 578.)  The therapist described Plaintiff's compliance with therapy as poor because

26   she attended less than sixty percent of her scheduled appointments.  (*Id.*)  A March 2013

27   treatment notes states that Plaintiff had poor compliance with her home exercise program.

28   (Tr. 22, 1288.)  Although there is evidence that Plaintiff "failed" physical therapy, there

1   is also substantial evidence to support the ALJ's conclusion that Plaintiff did not comply

2   with physical therapy.  *See Batson*, 359 F.3d at 1197-98 (stating that "[w]hen the

3   evidence before the ALJ is subject to more than one rational interpretation, [the court]

4   must defer to the ALJ's conclusion.").

5        Third, the ALJ rejected Dr. Burns' opinion because he found it less persuasive

6   than the opinions of the state agency medical consultants and less consistent with the

7   record as a whole.  (Tr. 24.)  A nonexamining doctor's opinion may amount to substantial

8   evidence "when it is consistent with other independent evidence in the record."

9   *Tonapetyan*, 242 F.3d at 1149.   On May 9, 2012, state agency medical consultant

10  Dr. Bates reviewed the medical records and considered the objective evidence, including

11  X-rays, an MRI, and EMG.  (Tr. 627.)  She opined that Plaintiff was capable of doing

12  light work.  (Tr. 620-29.)  Jim Takach, M.D., reviewed the medical evidence on January

13  15, 2013, and affirmed Dr. Bates' opinion.  (Tr. 1097.)

14       Plaintiff argues that Dr. Bates' inaccurately summarized the evidence because she

15  stated that Plaintiff did not receive epidural injections.  (Doc. 14 at 11.)   Dr. Bates

16  completed her review of the record on May 9, 2012.  She noted that, in 2011, Plaintiff's

17  insurance company had denied Plaintiff epidural injections and that she was scheduled

18  for physical therapy and Percocet.  (Tr. 627.)  A July 2011 treatment notes supports

19  Dr. Bates' description of the record.  (Tr. 523.)  Plaintiff also argues that the ALJ erred in

20  relying on Dr. Bates' opinion because she is a plastic surgeon.  (Doc. 14 at 10-11.)

21  Dr. Bates' specialty as a plastic surgeon did not preclude the ALJ from relying on her

22  opinion to support his disability determination.  *See Crane v. Shalala*, 76 F.3d 251, 254

23  (9th Cir. 1996) (a licensed physician who was not a psychiatrist was qualified to state a

24  medical opinion on claimant's mental state).

25       For these reasons, the Court concludes that the ALJ did not err in assigning no

26  weight to Dr. Burns' opinions and substantial evidence supports the ALJ's reasons for

27  discounting his opinion.

28

1      ## 2.      Weight Assigned to Headache Questionnaires

2         ### a.      May 4, 2012 Headache Questionnaire

3           A May 4, 2012 headache questionnaire states that Plaintiff had daily headaches

4    that lasted all day.  (Tr. 619.)  The questionnaire also states that headaches interfered with

5    Plaintiff's ability to work and that Plaintiff could not work.  (*Id.*)  The ALJ assigned no

6    weight to this opinion.  (Tr. 25.)  He explained that the opinion on the questionnaire was

7    subjective, conclusory, and lacked explanation.  (*Id.*)   The ALJ also noted that the

8    signature was illegible.  (*Id.*)  Plaintiff asserts that if the ALJ found the signature illegible,

9    he was required to further develop the record.  (Doc. 14 at 11.)  The Court disagrees.

10          An ALJ's "duty to develop the record further is triggered only when there is

11   ambiguous evidence or when the record is inadequate to allow for proper evaluation of

12   the evidence."  *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001) (internal

13   citation omitted).  Here, the record as a whole was not ambiguous or inadequate.  The

14   lack of a legible signature on the May 4, 2012 opinion did not make it ambiguous.

15          As the ALJ found, the statement that Plaintiff had daily headaches that lasted the

16   entire day was most likely based on her subjective complaints.  (Tr. 619.)  Because the

17   ALJ properly discredited Plaintiff's subjective complaints as discussed in Section VI.B

18   below, the ALJ did not err in this regard.  *See Bray*, 554 F.3d at 1228 (9th Cir. 2009)

19   (ALJ properly discounts a physician's opinion that is based solely upon claimant's self-

20   reporting if ALJ concludes that claimant's self-reporting is not credible); *see also Thomas*

21   *v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002) (rejecting physician's opinion in part

22   because it was based on claimant's subjective complaints, not on new objective findings);

23   *Tonapetyan*, 242 F.3d at 1149 (medical opinion premised on subjective complaints may

24   be disregarded when record supports ALJ in discounting claimant's credibility).

25          Additionally, as the ALJ noted, the opinion that Plaintiff's headaches would

26   "interfere with [her] ability to work" and that she could not work, was conclusory.

27   (Tr. 25, 619.)  The opinion did not include any specific work-related limitations, but

28   generally concluded that Plaintiff could not work.  An ALJ need not accept a treating

1    physician's opinion which is "brief and conclusory in form with little in the way of

2    clinical findings to support [its] conclusion."   *Young v. Heckler*, 803 F.2d 963, 968 (9th

3    Cir. 1986).   The Court concludes that the ALJ did not err in assigning no weight to the

4    May 4, 2012 opinion as conclusory.

5                   **b.     Dr. Shah's Headache Questionnaire**

6           The ALJ also gave no weight to a headache questionnaire that treating neurologist

7    Dr. Shah completed in May 2013.   (Tr. 25, 1317.)   Dr. Shah stated that Plaintiff had

8    "mixed type" headaches that lasted "for days."   (Tr. 1317.)   He stated that Plaintiff's

9    headaches caused pain at a level "ten" and that they interfered with her concentration,

10   attention, memory, and capacity to work.   (*Id.*)   He opined that Plaintiff's headaches

11   would cause an "undetermined" amount of absences from work monthly.   (*Id.*)   The ALJ

12   rejected Dr. Shah's opinion because he found the opinion subjective, unspecific, and

13   unsupported by Dr. Shah's treatment notes.   (Tr. 24-25.)

14          As the ALJ noted, Dr. Shah's opinion did not indicate to what extent Plaintiff's

15   headaches would cause her to be off task.   (Tr. 24.)   Additionally, although Dr. Shah

16   opined that Plaintiff's headaches would interfere with her concentration, attention, and

17   memory, he did not quantify those limitations.   *See Young*, 803 F.2d at 968.

18   Additionally, because the ALJ properly discredited Plaintiff's subjective complaints as

19   discussed in Section VI.B below, the ALJ did not err in discounting Dr. Shah's opinion

20   because it was based on Plaintiff's subjective complaints.   *See Bray*, 554 F.3d at 1228.

21          Finally, substantial evidence in the record supports the ALJ's conclusion that

22   Dr. Shah's treatment notes did not support his opinion.    Plaintiff cites several of

23   Dr. Shah's treatment notes as supporting his 2013 opinion on the headache questionnaire.

24   (Doc. 14 (citing Tr. 633, 634, 638, 639).)   On February 2011, Dr. Shah saw Plaintiff for

25   headaches.   (Tr. 639-40.)   He noted that Plaintiff was sensitive to light and noise during

26   an attempted EMG.   (Tr. 639.)   On examination, Plaintiff was alert, oriented, could move

27   her upper and lower extremities, had full strength, normal reflexes, normal coordination

28

1    and gait, and normal sensory responses.  (Tr. 640.)  Dr. Shah noted that a CT scan was

2    normal, and that Plaintiff agreed to have an EMG.  (*Id.*)

3            On May 4, 2012, Plaintiff saw Dr. Shah for a follow-up appointment.  (Tr. 633.)

4    Dr. Shah noted that when he entered the examination room, Plaintiff was lying in the

5    dark because of her headache.    (*Id.*)  Dr. Shah noted that an EMG and an EEG were

6    normal.  (Tr. 633, 638.)  On examination, Plaintiff was alert, oriented, could move her

7    upper and lower extremities, had full strength, normal reflexes, normal coordination and

8    gait, and normal sensory responses. (Tr. 640.)

9            Although the record indicates that Plaintiff received ongoing treatment for

10   headaches and could be interpreted more favorably to Plaintiff, substantial evidence in

11   the record supports the ALJ's conclusion that Dr. Shah's opinion was not supported by

12   his treatment notes.  *See Batson*, 359 F.3d at 1197-98 (stating that "[w]hen the evidence

13   before the ALJ is subject to more than one rational interpretation, [the court] must defer

14   to the ALJ's conclusion.").   The ALJ did not err in assigning no weight to Dr. Shah's

15   headache questionnaire and his reasons for doing so are supported by substantial

16   evidence in the record.

17          **B.      The ALJ's Credibility Determination**

18          Plaintiff also asserts that the ALJ erred by discrediting her symptom testimony

19   without providing clear and convincing reasons.  (Doc. 14 at 17.)  An ALJ engages in a

20   two-step analysis to determine whether a claimant's testimony regarding her pain or other

21   symptoms is credible.  *See Treichler v. Comm'r of Soc. Sec.*, 775 F.3d 1090, 1102 (9th

22   Cir. 2014); *see also Garrison v. Colvin*, 759 F.3d 995, 1014-15 (9th Cir. 2014) (citing

23   *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007)).

24          "First, the ALJ must determine whether the claimant has presented objective

25   medical evidence of an underlying impairment 'which could reasonably be expected to

26   produce the pain or other symptoms alleged.'"  *Lingenfelter*, 504 F.3d at 1036 (quoting

27   *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)).  The claimant is not

28   required to show objective medical evidence of the pain itself or of a causal relationship

between the impairment and the symptom.  *Smolen*, 80 F.3d at 1282.  Instead, the claimant must only show that an objectively verifiable impairment "could reasonably be expected" to produce his pain.  *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen*, 80 F.3d at 1282); *see also Carmickle v. Comm'r of Soc. Sec.*, 533 F.3d at 1160–61 (9th Cir. 2008) ("requiring that the medical impairment 'could reasonably be expected to produce' pain or another symptom . . . requires only that the causal relationship be a reasonable inference, not a medically proven phenomenon").

Second, if a claimant shows that she suffers from an underlying medical impairment that could reasonably be expected to produce her pain or other symptoms, the ALJ must "evaluate the intensity and persistence of [the] symptoms" to determine how the symptoms, including pain, limit the claimant's ability to work.  *See* 20 C.F.R. § 404.1529(c)(1).  In making this evaluation, the ALJ may consider the objective medical evidence, the claimant's daily activities, the location, duration, frequency, and intensity of the claimant's pain or other symptoms, precipitating and aggravating factors, medication taken, and treatments for relief of pain or other symptoms.  *See* 20 C.F.R. § 404.1529(c); *Bunnell*, 947 F.2d at 346.

At this second evaluative step, the ALJ may reject a claimant's testimony regarding the severity of her symptoms only if the ALJ "makes a finding of malingering based on affirmative evidence," *Lingenfelter*, 504 F.3d at 1036 (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006)), or if the ALJ offers "clear and convincing reasons" for finding the claimant not credible.[4]  *Carmickle*, 533 F.3d at 1160 (quoting *Lingenfelter*, 504 F.3d at 1036).  Because the ALJ did not specifically find evidence of malingering, the ALJ was required to provide clear and convincing reasons for concluding that Plaintiff's subjective complaints were not wholly credible.[5]

---

[4]  The Ninth Circuit has rejected the Commissioner's argument (Doc. 16 at 6) that a lesser standard than "clear and convincing" should apply.  *See Garrison*, 759 F.3d at 1015 n.18.

[5]  The ALJ stated that Plaintiff's performance and behavior during mental status examinations was "evidence of possible malingering," but he did not discredit Plaintiff's testimony on that basis.  (Tr. 23.)

### 1.    Inconsistency between Reported Activities and Testimony

The ALJ discounted Plaintiff's symptom testimony because the medical record included a range of activities that were "at odds with what Plaintiff alleged in her hearing testimony." (Doc. 21.)  As discussed below, this is a clear and convincing reason for discounting Plaintiff's credibility that is supported by substantial evidence in the record.

As part of the overall disability analysis, and in weighing various allegations and opinions, the ALJ must consider whether there are any inconsistencies in the evidence, such as Plaintiff's inconsistent statements.  *See* 20 C.F.R. § 404.1529(c)(4) (stating that an ALJ must consider "whether there are any inconsistencies in the evidence."); SSR 96-7p, 1996 WL 374186, at *5 (stating that a strong indicator of the credibility an individual's statements is their consistency, both internally and with other information in the record).  Thus, the ALJ properly considered inconsistencies between Plaintiff's hearing testimony and the medical record.

At the administrative hearing, Plaintiff testified that about four to five years before the September 2013 hearing, or in 2008 and 2009, she rode her bike every day.  (Tr. 66.)  She also testified that in 2010 she told Dr. Mahadevan that she was not riding her bike every day.  (*Id.*)  She said she tried to get out once a week or a few times a month.  (*Id.*)  However, on a November 23, 2010 treatment note, Dr. Mahadevan noted that Plaintiff reported that she rode her bike every day.  (Tr. 541.)  Thus, Plaintiff's hearing testimony was inconsistent with Dr. Mahadevan's treatment note.

Plaintiff also testified that she rode her bike before she had slip and fall in November 2010.  (Tr. 57-58, 66.)  Then she stated that she had not ridden her bike.  (Tr. 66.)  However, as the ALJ noted (Tr. 21 (citing Admin. Hrg. Ex. 7F at 29)), a March 2011 treatment note indicates that Plaintiff was active, riding a bicycle, walking, and lifting.  (Tr. 1026.)  Additionally, as the ALJ noted, physical therapy records from April 2011 indicate that Plaintiff rode her bike and walked about thirty minutes a day.  (Tr. 21-22, 1214.)  Additionally, primary care records from November 8, 2011, report that Plaintiff rode a bike, walked, and exercised.  (Tr. 22, 652.)

1   Because Plaintiff gave conflicting testimony about her ability to ride her bike and

2   testimony that conflicted with several medical records, the ALJ properly found Plaintiff's

3   credibility diminished on this basis. *See Thomas v. Barnhart,* 278 F.3d 947, 958-59 (9th

4   Cir. 2002) (inconsistencies in a claimant's testimony weigh against her credibility).

5                    **2.      Social Isolation**

6       The ALJ also discounted Plaintiff's credibility because he found her "complaints

7   of social isolation" inconsistent with her report, "during the same therapy appointment,"

8   that she went to a baby shower. (Tr. 22.) He also noted that Plaintiff referred to friends

9   in other counseling records. (Tr. 22 (citing Admin. Hrg. Exs. 51F at 37, 41, 49).)[6]

10      Plaintiff argues that she did not testify that she was socially isolated, but testified

11  that she did not "have many friends" and did not "get out much." (Doc. 14 at 18 (citing

12  Tr. 57).)   The ALJ, however, did not discredit Plaintiff based on an inconsistency

13  between her hearing testimony and the record.  Rather, he discredited her based on

14  internal inconsistencies in several treatment notes.  (Tr. 22.)  As discussed below, the

15  treatment notes that the ALJ cited do not support the conclusion that Plaintiff gave

16  contradictory reports regarding her level of social interaction.

17      The ALJ cites a July 22, 2013 treatment note, which indicates that an objective of

18  Plaintiff's treatment at Phoenix Interfaith Counseling was to "increase positive

19  communication and social interaction."  (Tr. 1417.)  During that same appointment,

20  Plaintiff reported that she had recently attended a baby shower where she interacted with

21  people. (*Id.*) However, the treatment note indicates that Plaintiff had difficulty with her

22  anger and communication style and that she "resisted" asking people certain questions at

23  the baby shower. (*Id.*)  Thus, it is unclear whether Plaintiff was socially isolated or

24  whether she had difficulty engaging in positive social interaction.  The other treatment

25  notes the ALJ cites do not specifically include reports of social isolation.  (Tr. 1405,

26  1409.)  The August 21, 2013 treatment note states that Plaintiff reported "avoidance

27  behaviors," but does not describe the specific behaviors and does not specifically refer to

28  _____

[6] These administrative hearing exhibits appear at Tr. 1405, 1409, and 1417.

1    social isolation.  (Tr. 1405.)  The September 10, 2013 treatment note again indicates that

2    counselling had a goal of "increase[ing] positive communication and social interaction."

3    (Tr. 1409.)  Plaintiff discussed having friends, but said they did not keep clean houses

4    and reported leaving a friend's home due to bug bites.  (Tr. 1409.)

5        These treatment notes do not support the ALJ's conclusion that Plaintiff gave

6    contradictory statements amount being socially isolated.  These treatment notes do not

7    state that Plaintiff reported "social isolation," and during these counseling sessions

8    Plaintiff reported limitations in social functioning that were consistent with the behavior

9    she reported.  Accordingly, the record does not support the ALJ's determination that

10    Plaintiff gave contradictory statements about being socially isolated.

11        **3.**     **Non-Compliance with Treatment and Poor Effort**

12        The ALJ next found that Plaintiff was noncompliant with treatment.  (Tr. 22.)  An

13    "individual's statements may be less credible if . . . the medical reports or records show

14    that the individual is not following the treatment as prescribed and there are no good

15    reasons for this failure."  SSR 96-7p, 1996 WL 374186, at *7.

16        The ALJ noted that Plaintiff did not comply with her home exercise program and

17    that she canceled or failed to attend behavioral health counseling appointments.  (Tr. 22-

18    23.)  Substantial evidence in the record supports this determination.  (Tr. 1268, 1394,

19    1395-99, 1401-02, 1410, 1412, 1425-26, 1430, 1432.)  Plaintiff asserts that she stopped

20    attending counseling appointments because she thought there were bed bugs at the clinic.

21    (Doc. 14 at 19, Tr. 1395, 1398.)  However, she also attributed the bug bites to a friend's

22    home.  (Tr. 1409.)

23        In addition to reflecting that Plaintiff had poor attendance at behavioral health

24    appointments, the record reflects that Plaintiff had poor compliance with physical

25    therapy.  (Tr. 22, 580, 575, 1288.)  The ALJ also discounted Plaintiff's credibility

26    because she gave a poor effort on WAIS-IV tests during two consultative examinations

27    and made errors that were so atypical the examining physician thought Plaintiff's effort

28    was intentionally poor.  (Tr. 22 (citing Admin. Hrg. Ex. 18F at 3).)  Plaintiff argues that

1    she suffers from anxiety and depression, suggesting that those issues excused her poor
2    performance on the intelligence tests.  (Doc. 14 at 19.)  However, as the ALJ noted,
3    Dr. Rabara and Dr. Weyer believed her poor efforts were intentional.  (Tr. 22, 660-61,
4    1088-89.)

5            Plaintiff's poor compliance with treatment and medical testing is a clear and
6    convincing reason to support the ALJ's adverse credibility determination and that reason
7    is supported by substantial evidence in the record.  *See Lingenfelter v. Astrue*, 504 F.3d
8    1028, 1040 (9th Cir. 2007) (whether the claimant failed to follow, without adequate
9    explanation, a prescribed course of treatment may be considered in assessing claimant's
10   credibility).

11           Although the Court does not accept all of the ALJ's reasons in support of his
12   adverse credibility determination, the ALJ provided sufficient legally sufficient reasons
13   that are supported by substantial evidence in support of his credibility determination and,
14   therefore, the Court affirms that determination.  *See Batson*, 359 F.3d at 1197 (stating that
15   the court may affirm an ALJ's overall credibility conclusion even when not all of the
16   ALJ's reasons are upheld); *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001)
17   (stating that "[e]ven if we discount some of the ALJ's observations of [the claimant's]
18   inconsistent statements and behavior . . . we are still left with substantial evidence to
19   support the ALJ's credibility determination.").

20           **C.     Plaintiff's Impairments do not Meet Listing 12.05C**

21           Plaintiff argues that the ALJ erred at step three of the sequential evaluation
22   process by finding that her impairments did not meet the criteria of Listing 12.05C.
23   (Doc. 14 at 13.)  As discussed below, the Court concludes that the ALJ did not err at step
24   three.

25           Conditions contained in the Listing of Impairments (Listings) are considered so
26   severe that "they are irrebuttably presumed disabling, without any specific finding as to
27   the claimant's ability to perform his past relevant work or any other jobs." *Lester*, 81
28   F.3d at 828.  The Listings were "designed to operate as a presumption of disability that

1   makes further inquiry unnecessary." *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990).  If a

2   claimant shows that her impairment or combination of impairments meets or equals a

3   Listing, she will be found presumptively disabled.  20 C.F.R. §§ 416.925-416.926.

4         Plaintiff contends that the evidence establishes that her IQ between 60 and 70 in

5   combination with her other impairments meets Listing 12.05C, and thus the ALJ erred at

6   step three.  (Doc. 14 at 13.)  The Commissioner disputes this assertion (Doc. 16 at 15),

7   and Plaintiff's reply does not address the Commissioner's arguments on this issue.

8   (Doc. 17.)  To be considered disabled under Listing 12.05C, Plaintiff must show the

9   following:

10            12.05 Intellectual Disability: Intellectual disability refers to
              significantly subaverage general intellectual functioning with
11            deficits in adaptive functioning initially manifested during the
              developmental period; i.e., the evidence demonstrates or
12            supports onset of the impairments before age 22.

13            The required level of severity for this disorder is met when
              the requirements in A, B, C, or D are satisfied.

14            * * *

15            C.  A valid verbal, performance, or full scale IQ of 60 through
16            70 and a physical or other mental impairment imposing an
              additional and significant work-related limitation of
17            function[.]

18   20 C.F.R. Part 404, Subpt. P, App. 1 § 12.05.C.

19         The introductory paragraph of Listing 12.05 defines intellectual disability as

20   "significantly subaverage general intellectual functioning with deficits in adaptive

21   functioning" beginning before the age of twenty two.  *Id.* § 12.05.  This diagnostic

22   description is separate from the specific criteria measuring the severity of the mental

23   impairment.  *See* 20 C.F.R. § 416.925(c)(3) ("We will find that your impairment(s) meets

24   the requirements of a listing when it satisfies all of the criteria of that listing, including

25   any relevant criteria in the introduction, and meets the duration requirement . . . .").  The

26   relevant severity prong requires a "valid verbal, performance, or full scale IQ of 60

27   through 70 and a physical or other mental impairment imposing an additional and

28

1    significant work-related limitation of function."   20 C.F.R. pt. 404, subpt. P, app. 1,

2    § 12.05(C).

3          Therefore, to meet the requirements of Listing 12.05C, a claimant must (1) satisfy

4    the diagnostic description of intellectual disability, (2) meet the temporal requirement,

5    (3) have a valid verbal, performance, or full scale IQ of 60 through 70, and (4) have a

6    physical or mental impairment that imposes an additional and significant work-related

7    limitation of function.  *See Randall v. Astrue*, 570 F.3d 651, 659-60 (5th Cir. 2009)

8    (construing Listing 12.05 as requiring claimants to satisfy the diagnostic description's

9    substantive requirements independently of the severity criteria); *Brooks v. Barnhart*, 167

10   Fed. App'x 598, 600 (9th Cir. 2006) (finding IQ scores were likely invalid but noting that

11   "[i]n any event, the scores, alone, are insufficient to establish a severe impairment" and

12   record did not show significantly subaverage intellectual functioning).

13         The ALJ determined that Plaintiff did not satisfy the criteria of Listing 12.05C, in

14   part, because her recent IQ scores were invalid. (Tr. at 20.)  An ALJ has the authority to

15   determine whether an IQ score is valid.  *See Thresher v. Astrue*, 283 Fed. App'x 473, 475

16   (9th Cir. 2008) (stating that "an ALJ can decide that an IQ score is invalid.").  To support

17   his conclusion that Plaintiff's IQ scores were invalid, the ALJ noted that although

18   Plaintiff had full scale IQ scores of 63 and 65 on WAIS-IV tests, the consultative

19   examining psychologists' reports indicate that those results likely underestimated

20   Plaintiff's abilities due to her poor effort during testing.  (Tr. 20.)  "[S]ince the results of

21   intelligence tests are only part of the overall assessment, the narrative report that

22   accompanies the test results should comment on whether the IQ scores are considered

23   valid and consistent with the developmental history and the degree of functional

24   limitation."  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(D)(6)(a).

25         Dr. Rabara stated that Plaintiff's scores on the WAIS-IV intelligence test were

26   provided "only for reference" because their "validity is uncertain secondary to

27

28

1   questionable effort."[7]   (Tr. 660.)  Dr. Rabara estimated that Plaintiff had borderline to low
2   average cognitive skills, but "her current scores were much worse and some highly
3   atypical errors on a screening measure of effort make her overall effort very
4   questionable."   (Tr. 661.)   Dr. Rabara referred to one error as "very atypical and
5   suggestive of intentionally poor effort."  (Tr. 660.)

6        Similarly, state agency consultant Dr. Weyer examined Plaintiff and stated that
7   although she "earned an IQ of 65," she was "observed to give up easily on more difficult
8   tasks and provide very quick responses at this point."  (Tr. 1088.)  Dr. Weyer found that
9   Plaintiff's score "may reflect lack of optimal effort and therefore is likely an
10  underestimation of her actual abilities."  (Id.)  Dr. Weyer concluded that while Plaintiff
11  seemed to have some level of cognitive impairment, her scores were "difficult to interpret
12  due to a perceived lack of effort during testing."[8]  (Tr. 1089.)

13       Dr. Rabara's and Dr. Weyer's opinions are substantial evidence in support of the
14  ALJ's conclusion that Plaintiff did not have valid full scale IQ scores of 60 through 70,
15  and thus did not meet the severity prong which requires a "valid verbal, performance, or
16  full scale IQ of 60 through 70 and a physical or other mental impairment imposing an
17  additional and significant work-related limitation of function."  20 C.F.R. pt. 404, subpt.
18  P, app. 1, § 12.05(C).  Even if Plaintiff had valid full scale IQ scores of 60 through 70,
19  the ALJ properly determined that Plaintiff did not satisfy Listing 12.05C because, as the
20  ALJ noted, she was thirty-nine at the alleged disability onset date, and there is no
21  evidence that intellectual disability was a severe impairment before Petitioner reached

---

[7]  The ALJ gave significant weight to Dr. Rabara's opinion.  (Tr. 25.) Plaintiff does not challenge the ALJ's assessment of this opinion or the opinion itself.  (Doc. 14 at 13-15).

[8]  In the body of her report, Dr. Weyer states that "[c]urrent testing is considered to be an accurate indicator of claimant's current level of functioning."  (Tr. 1088.) However, she concludes that "[o]n intelligence testing, claimant's effort was questionable.  Her IQ on the CTONI-2 fell in the extremely low range.  On the MMSE, she scored 20/30, demonstrating some degree of cognitive impairment.  However, these scores are difficult to interpret due to claimant's perceived lack of effort during testing." (Tr. 1089.)  Considering Dr. Weyer's conclusion that Plaintiff's lack of effort made her test scores difficult to interpret, the ALJ did not err in concluding that the intelligence test scores that Dr. Weyer reported were not valid full scale IQ scores.

age twenty two.  (Tr. 20); *see* 20 C.F.R. pt. 404, subpt. P, app. 1, Listing 12.05.[9]  The record reflects that Plaintiff did not have a history of special education classes, she earned a GED, and she completed some community college courses.  (Tr. 45, 257-58, 658, 1086.)  She also worked as a custodian, warehouse worker, and maintenance worker for a number of years and reported that her job duties included ordering parts, maintaining inventory, and using a computer.  (Tr. 47, 58-59, 249-50, 257-58, 301-08, 338-45, 658.)  As Dr. Rabara noted, Plaintiff's test scores seemed "much lower than what her reported education and work history suggest."  (Tr. 661.)

In conclusion, the ALJ did not err in finding that Plaintiff did not satisfy the criteria of Listing 12.05C and substantial evidence supports his determination that Plaintiff did not have any adaptive functioning deficits before age twenty two and that she did not have a valid full scale IQ score between 60 and 70.  Accordingly, the ALJ did not err at step three of the sequential evaluation process.

### D.      The ALJ's Assessment oF Plaintiff's RFC

#### 1.      Limitations identified in Dr. Weyer's Opinion

In 2012, Dr. Weyer completed a medical source statement.  (Tr. 1090.)  She opined that Plaintiff was mildly limited in some areas of understanding, memory, and adaption.  (*Id.*)  In areas of sustained concentration and persistence, Dr. Weyer opined that Plaintiff "may perform better when she is receiving supervision, including explanation of tasks, extra time to complete tasks, and redirection as needed."  (*Id.*)  She also found that Plaintiff "may present with moderate difficulties on tasks requiring an ability to complete a normal workday or workweek without interruption from psychologically based symptoms."  (*Id.*)  The ALJ assigned this opinion "significant weight."  (Tr. 24 (citing Admin. Hrg. Ex. 31F).)  He specifically noted that Dr. Weyer opined that Plaintiff would have "moderate difficulties in sustained concentration and

---

[9]      Plaintiff's discussion of Listing 12.05C does not address the temporal requirement contained in the introductory paragraph of Listing 12.05, which defines intellectual disability as "significantly subaverage general intellectual functioning with deficits in adaptive functioning" beginning before the age of twenty two.  (Doc. 14 at 13-15); *see* 20 C.F.R. Part 404, Subpt. P, App. 1 § 12.05.

persistence." (Tr. 24.)  He did not specifically reject any portion of Dr Weyer's opinion. (*Id.*)

Plaintiff argues that although the ALJ assigned significant weight to Dr. Weyer's opinions, the ALJ failed to include in the RFC Dr. Weyer's specific opinions that Plaintiff had moderate limitations of concentration and persistence (moderate difficulties completing tasks requiring an ability to complete a normal workday and workweek), and her opinion that Plaintiff would perform best with extra time to complete tasks.  (Doc. 14 at 16.)  Thus, Plaintiff argues that the ALJ erred in formulating the RFC.[10]  (*Id.*)

The Commissioner responds that Dr. Weyer's opinions were equivocal because she used the word "may" before describing Plaintiff's limitations.  (Doc. 16 at 18.)  The ALJ gave Dr. Weyer's opinion significant weight and did not find her opinions equivocal.  (Tr. 24.)  Accordingly, the Court does not address the Commissioner's suggestion that Dr. Weyer's opinions should be discounted because they were equivocal. *See Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1225-26 (9th Cir. 2009) (The court's review is limited to "reasons and factual findings offered by the ALJ — not post hoc rationalizations that attempt to intuit what the adjudicator may have been thinking.").

Here, the ALJ specifically accepted Dr. Weyer's opinions that Plaintiff had "moderate difficulties in sustained concentration and persistence."  (Tr. 24.)  Although the ALJ did not specifically mention Dr. Weyer's opinion that Plaintiff needed extra time to complete tasks, she assigned Dr. Weyer's opinion "significant weight" and did not reject any portion of her opinion.  (*Id.*)  However, the RFC only limited Plaintiff to jobs where "interpersonal contact is incidental to work performed; complexity of tasks is learned and performed by rote, with few variables, and little judgment; and supervision is simple, direct, and concrete."  (Tr. 21.)  The Court agrees with Plaintiff that this RFC did

---

[10]  Plaintiff also argues that the ALJ erred by assessing an RFC that did not include Dr. Weyer's opinion that Plaintiff would perform better when receiving supervision and redirection.  (Doc. 14 at 16.)  The ALJ's RFC assessment accounted for these limitations by limiting Plaintiff to work where the "complexity of tasks is learned and performed by rote, with few variables, and little judgment, and supervision is simple, direct, and concrete."  (Tr. 21.)

1    not account for moderate limitations in concentration and persistence or the need for

2    extra time to complete tasks.

3        In a similar case, *Brink v. Comm'r of Soc. Sec. Admin.*, 343 Fed. App'x 211, 212

4    (9th Cir. 2009), the ALJ accepted evidence that the claimant had moderate difficulty with

5    concentration, persistence, or pace, but posed hypothetical questions to the vocational

6    expert based on an RFC that "referenced only 'simple, repetitive work,' without

7    including limitations on concentration, persistence, and pace." The Ninth Circuit found

8    that the ALJ erred and remanded the case so the ALJ could clarify his hypothetical and

9    determine whether the claimant could perform gainful employment in the national

10   economy. *Id.* at 212-13. *See also Bentancourt v. Astrue*, 2010 WL 4916604, at *3-4

11   (C.D. Cal. Nov. 27, 2010) (when the ALJ accepted medical evidence of the plaintiff's

12   limitations in maintaining concentration, persistence, or pace, a hypothetical question to

13   the vocational expert including the plaintiff's restriction to "simple, repetitive work," but

14   excluding the plaintiff's difficulties with concentration, persistence, or pace resulted in a

15   vocational expert's conclusion that was "based on an incomplete hypothetical question

16   and unsupported by substantial evidence."); *Melton v. Astrue*, 2010 WL 3853195, at *8

17   (D. Or. 2010), *aff'd.*, 442 Fed. App'x 339 (9th Cir. 2011) (the ALJ erred in her

18   assessment of the plaintiff's RFC when the assessment included the plaintiff's restriction

19   to simple, repetitive tasks, but did not include the plaintiff's mild-to-moderate limitations

20   in maintaining concentration, persistence, or pace).

21       Here, as in *Brink*, the ALJ accepted Dr. Weyer's opinions that Plaintiff had

22   moderate limitations in concentration and persistence and that she needed extra time to

23   complete tasks.[11]  (Tr. 24.)  However, the ALJ did not include these limitations in the

24   RFC.  (*Compare* Tr. 21 *with* Tr. 1090.)  Accordingly, the ALJ erred in formulating the

25   RFC.  That error was not harmless because the vocational expert's testimony — upon

26

27       [11]    Dr. Weyer specifically opined that Plaintiff "may present with moderate
     difficulties on tasks requiring an ability to complete a normal workday or workweek
28   without interruption from psychologically based symptoms." (Tr. 1090.) The ALJ
     apparently summarized Dr. Weyer's opinion as finding that Plaintiff had "moderate
     difficulties in sustained concentration and persistence." (Tr. 24.)

1    which the ALJ relied to determine that Plaintiff could not perform her past relevant work,

2    but could perform other work that existed in significant number in the national economy

3    (Tr. 25-27, 70-71) — was based on a hypothetical question that described an RFC that did

4    not include all of the limitations that Dr. Weyer identified in her opinion and which the

5    ALJ assigned significant weight.[12]  *See Stout v. Comm'r of Soc. Sec.*, 454 F.3d 1050,

6    1055 (9th Cir. 2006) (an ALJ's error is harmless when it is "irrelevant to the ALJ's

7    ultimate disability conclusion."); *Andrews v. Shalala*, 53 F.3d 1035, 1044 (9th Cir. 1995)

8    (for the vocational expert's testimony to constitute substantial evidence, the hypothetical

9    question posed must "consider all of the claimant's limitations").  As discussed in Section

10   VII below, the Court remands this matter for further proceedings to address this error.

11              **2.       Limitations in Dr. Daugherty's Narrative of her Opinion**

12         Plaintiff also argues that the ALJ erred by assessing an RFC that did not include

13   the moderate limitations identified in Dr. Daugherty's January 16, 2013 opinion.

14   (Doc. 14 at 17.)  In 2013, Dr. Daugherty completed a Mental RFC Assessment form.

15   (Tr. 1098-1101.)  Section I of the RFC assessment is entitled Summary Conclusions.

16   (Tr. 1098-1100.)  Dr. Daugherty marked "X" next to statements included in Section I

17   (Section I of the worksheet) to indicate that Plaintiff was moderately limited in her

18   abilities to carry out detailed instructions, maintain attention and concentration for

19   extended periods, sustain an ordinary routine without special supervision, complete a

20   normal workday or workweek without interruption from psychologically-based

21   symptoms, perform at a consistent pace without an unreasonable number and length of

22   rest periods, to accept instruction and respond appropriately to criticism, respond

23

24   _____

25         [12] The ALJ asked the vocational expert to assume an individual of Plaintiff's "age,
     education, and work experience who is able to perform work at the light exertional level,"
26   and where "interpersonal contact is incidental to work performed, complexity of tasks is
     learned and performed by rote with few variables and little judgment required.
27   Supervision is simple, direct, and concrete." (Tr. 70.)  The vocational expert testified that
     a person with those limitations could not perform Plaintiff's past relevant work, but could
28   perform other work that existed in significant number in the national economy.  (Tr. 70-
     71.)

1    appropriately to changes in the work setting, and the ability to set realistic goals or make

2    plans independently of others.[13]  (*Id.*)

3         Section III of the RFC form is entitled Functional Capacity Assessment.

4    (Tr. 1100.)  In Section III, Dr. Daugherty summarized the limitations she noted in Section

5    I into her opinion that Plaintiff "is able to perform work where interpersonal contact is

6    incidental to work performed, e.g. assembly work: complexity of the tasks is learned and

7    performed by rote, few variables, little judgment; supervision required is simple, direct

8    and concrete (unskilled)."   (*Id.*)   The ALJ's RFC includes this specific summary of

9    Plaintiff's limitations.  (*Compare* Tr. 20-21 *with* Tr. 1100-01.)

10        Plaintiff argues that Dr. Daugherty's Section III summary of Plaintiff's limitations

11   is inconsistent with the specific limitations she marked on Section I of the RFC form.

12   (Doc. 14 at 16-17.)  Plaintiff finds it "strange[]" that Dr. Daugherty's narrative has "less

13   severe limitations" than the worksheet she completed.   (Doc. 14 at 16-17 (citing

14   Tr. 1100-01).)  Plaintiff appears to argue that the ALJ erred by failing to include in the

15   RFC the specific limitations that Dr. Daugherty noted in Section I of the RFC assessment

16   form.  (Doc. 14 at 17.)

17        The Court finds that the ALJ sufficiently accounted for the limitations

18   Dr. Daugherty identified by incorporating Dr. Daugherty's summary of those limitations

19   into Plaintiff's RFC.  (Tr. 20-21.)   As the Commissioner notes (Doc. 16 at 18), the

20   Agency's Program Operations Manual System (POMS) directs the ALJ to focus on the

21   narrative portion of the mental RFC assessment form that is contained in Section III of

22   the form, rather than the worksheet included in Section I.  POMS DI 25020.010 at B.1.[14]

23   The POMS explains that the purpose of Section I "is chiefly to have a worksheet to

24   ensure that the [examining doctor] considered each of these pertinent mental activities

25

26        [13]  Rather than marking the worksheet that appeared in the Summary Conclusions
     section of the RFC form (Section I) on the same pages on which the worksheet appeared,
27   Dr. Daugherty apparently reproduced that content from the RFC form and included it on
     a different page of the form.  (Tr. 1098-100.)
28

          [14]  https://secure.ssa.gov/aaps10/poms.nsf (last visited Apr. 1, 2015).

and the claimant's . . . limitation for sustaining these activities over a normal workday and workweek on an ongoing, appropriate, and independent basis." POMS DI 25020.010 at B.1.   The POMS specifies, "**[i]t is the narrative** written by the psychiatrist or psychologist in **section III** ("Functional Capacity Assessment") . . . **that adjudicators are to use as the assessment of RFC"**.   *Id*.   The POMS also specifies that "[a]djudicators must take the RFC assessment in section III and decide what significance the elements discussed in this RFC assessment have in terms of the person's ability to meet the mental demands of past work or other work." *Id.*

The record reflects that the ALJ complied with the POMS and properly accounted for Dr. Daugherty's opinion in his assessment of Plaintiff's RFC. (*Compare* Tr. 1100-10 *with* Tr. 20-21.)   The RFC that the ALJ assessed included Dr. Daugherty's entire summary of Plaintiff's mental limitations. (*Id.*)   Thus, the ALJ did not err with regards to Dr. Daugherty's opinion.

**VII.   Remand for Further Proceedings**

As set forth in Section VI.D.1 above, the ALJ erred by adopting Dr. Weyer's assessment that Plaintiff had moderate limitations of concentration and persistence and the need for extra time to complete tasks, but not including those limitations in Plaintiff's RFC.   Accordingly, the Court remands to the ALJ because additional proceedings are necessary to allow the ALJ to include these limitations in the RFC and to pose an accurate hypothetical question to the vocational expert to properly assess whether Plaintiff is able to perform work that exists in the national economy and whether she is disabled under the Act.[15]

Therefore, the Court reverses and remands this matter to the ALJ for the further proceedings in accordance with this Order.   *See Garrison v. Colvin,* 759 F.3d 995, 1020 n.26 (9th Cir. 2014) (noting that remand for further proceedings is appropriate when there are outstanding issues that must be resolved before a determination of disability can be

---

[15]   During the administrative hearing, neither the ALJ nor Plaintiff's counsel posed a hypothetical question to the ALJ that included all of the limitations that Dr. Weyer identified. (Tr. 69-74.)

1   made); *Harman v. Apfel*, 211 F.3d 1172, 1173-74 (9th Cir. 2000) (stating that the
2   decision to remand for further development of the record or for an award of benefits is
3   discretionary, and remand is appropriate when there are outstanding issues to be resolved
4   before a disability determination can be made).

5        Accordingly,

6        **IT IS ORDERED** that the Commissioner's disability determination is reversed
7   and this matter is remanded for further proceedings consistent with the Order.

8        **IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment in
9   favor of Plaintiff and terminate this matter.

10       Dated this 1st day of April, 2015.

Bridget S. Bade
United States Magistrate Judge